KANSAS CITY LIGHT & POWER COMPANY, a Corporation, Appellant, v. MIDLAND REALTY COMPANY, a Corporation.—93 S. W. (2d) 954.

Division One, April 23, 1936.

*Johnson, Lucas, Landon, Graves & Fane* for plaintiff-appellant.

*Scarritt, Jones & North* for defendant-appellant.

HAYS, J.—On February 27, 1908, the defendant entered into a contract with the plaintiff whereby plaintiff agreed to furnish steam heating service to defendant for several of defendant's buildings located in Kansas City, according to a certain schedule of rates set forth therein. This contract was for a period of five years beginning September 1, 1908, and ending August 31, 1913, with an option to defendant to extend the same for an additional five-year period by giving written notice. The option was exercised May 29, 1913. Before the contract had thus been extended the Public Service Commission Law of the State was enacted on March 17, 1913, and became immediately effective. [Laws, 1913, pp. 556-651, inc., R. S. 1929, Chap. 33.]

On June 28, 1917, the plaintiff filed a schedule of rates, effective August 1, 1917, for all of its steam heat customers. Under this

schedule the rates provided were higher than those provided in defendant's said contract.

Early in September, 1917, Kansas City and numerous users of plaintiff's steam heat service (not including this defendant) filed with the commission complaint against said schedule. After hearings had thereon the commission, on February 11, 1918, found said rates to be "unjust and unreasonable and said rates and prices unreasonably high." [Case No. 1353, 5 P. S. C. Mo. 20.] Thereupon the commission by order fixed and established as just and reasonable a lower schedule of rates and made same effective March 1, 1918. Plaintiff filed a new schedule accordingly. This rate also was higher than defendant's contract rate. It is to be noted that in its case No. 1353 the commission made no attempt to separate or to allocate values and operating expenses as between heating and electrical services, and was unwilling to do so "without further investigation."

On June 11, 1918, plaintiff entered complaint before the commission charging that its rates for electric service and for steam heat were inadequate and confiscatory. This complaint was docketed and heard as case No. 1615. [8 P. S. C. Mo. 223.] In this latter proceeding the commission made the allocation which had been omitted in the other case, predicating the same upon its finding that the rates put into effect March 1, 1918, were "inadequate, unjust and unreasonably low, and that during none of the time was heating revenue sufficient even to meet the fuel expenses alone." And the commission established new rates which displaced the next previous schedule of March 1, 1918. This new schedule did not become effective until December, 1919, as to steam heat, and was even higher than either of the next two preceding schedules. The commission further found that "heretofore the steam heat business had been carried at a loss, and this loss has been borne either by the light and power consumers or by the company. This is a distinctly inequitable condition which must be eliminated as soon as practicable." The findings and order of the commission established in said case No. 1615 were approved by this court in State ex rel. Mary B. Case, v. Pub. Service Comm., 298 Mo. 303, 249 S. W. 955.

After August 1, 1917, plaintiff billed defendant for its steam heating service under the schedule effective on that date until March, 1918, and thereafter under the schedule of the latter date until August 31, 1918, which was the date defendant claimed its contract expired; but defendant refused to pay as billed and made payments still in accordance with the rate in its contract, claiming said rates still to be effective, and such payments were credited on account by the plaintiff; the latter claiming the filed schedule rate was the legal and only rate that could be lawfully charged, and that the defendant's rate contract was void.

This case is for the recovery by the plaintiff from the defendant of the difference between the rates claimed to have been effective and the contract rates for the period August 31, 1917, to March 1, 1918 (pleaded in the first five counts of the petition), and the difference between the rates effective March 1, 1918, and the contract rates for the period from that date to and including August 31, 1918 (pleaded in the last six counts). The court *nisi*, on a trial without a jury, found against the plaintiff on the first five counts of the petition, and found for the plaintiff on the remaining six counts. Both parties appealed.

The foregoing statement with only slight change is the same as the statement contained in plaintiff's brief and conceded by defendant to be correct. The matters, orders and records referred to in the statement were all introduced in evidence on the trial. Apart from that there was no further evidence save the case of Marty v. Kansas City Light & Power Co., 303 Mo. 233, 259 S. W. 793, which was introduced. There is no dispute between the parties relative to the amount of the overplus of the schedule rates above defendant's contract rate. This case is before this court because of the constitutional questions of alleged impairment of obligations of contract and denial of due process raised as issues of law herein upon the undisputed facts.

The first contention of the parties is upon the legal effect of the rate schedule filed by plaintiff, as to whether the commission made no order between the date it was filed and the effective date, August 1, 1917.

The defendant concedes that the schedule of August 1, 1917, may have been prima facie a legal one upon its filing as to noncontract customers, but was actually not lawful as so determined by the commission upon a hearing thereon and the finding that "said schedule rates were unreasonably high and unjust and, therefore, unlawful." [P. S. C. Case No. 1353.] Defendant asserts that the last-mentioned order was final and conclusive under Section 5238, Revised Statutes 1929, which provides: "In all collateral actions or proceedings the orders and decisions of the commission which have become final shall be conclusive."

This schedule covering the period of its operation was considered and passed upon in State ex rel. Mary B. Case v. Pub. Service Comm., 298 Mo. supra, a proceeding to review the findings and order made by the commission (Case No. 1615, 8 P. S. C. Mo., p. 223), wherein our court on appeal, after reviewing said schedule and the proceedings leading to its establishment, held that the rates as fixed thereby were, under the statute (Sec. 5247, R. S. 1929), prima facie lawful and that the burden of proof rested upon the claimants to show by clear and satisfactory evidence that the order complained of was

unreasonable, or unlawful as the case might be; and further held that the evidence (same as in this case) did not show that the rates attacked were unreasonable or unlawful. The court also determined that the allocation made by the commission through its order in its case No. 1615 was not erroneous, but "was as accurate, fair and just, as reasonably possible or obtainable and should not be disturbed."

The Marty case, supra, was a suit brought by heating service users of Kansas City against the plaintiff in this case to recover the amount of alleged excess charges paid by them for steam heat furnished during the period covered by the rate schedule now under consideration. That case involved the same evidence that is in this case. The opinion therein points out that no order having been made by the commission suspending said schedule which materially increased the rates for heat, the same took effect after August 1, 1917. The plaintiffs there attacked said schedule as being unreasonable, excessive and unlawfully high, and as unlawful in that it was filed without notice. In support of those issues the plaintiffs introduced in evidence the finding and order of February 11, 1918, in the making of which (Case No. 1353, 5 P. S. C. Mo., p. 20) no attempt was made to separate or allocate values and operating expenses as between users of heat and electricity. The court (l. c. 242) pointed out that the commission did find that the heating rates under the plaintiff's schedule in effect from August 1, 1917, to March 1, 1918, were excessive, and the commission established a lower scale, which was yet higher than the one in effect prior to August 1, 1917. In response to the contention that this finding was conclusive in the collateral proceeding there at hand the court, after discussing the various orders and record facts which we have referred to in our statement, and after reviewing State ex rel. Mary B. Case v. Public Service Commission, supra, denied the contention, and held that the findings and order made by the commission in the later case No. 1615, and sustained by this court in Mary B. Case's suit, wholly destroyed the general prior findings made by the commission, with the result that there was no substantial evidence before the court that the rates which the consumers paid from August 1, 1917, to March 1, 1918, were excessive and unlawful, for on that matter the subsequent finding of the commission was to the contrary. The court specifically held that defendant's previous schedule was prospective in operation and made without prejudice as to what might thereafter be shown on a fuller investigation and upon actual tests; that the order of January 11, 1918, fixed prospective rates only; that the rates which plaintiffs did actually pay were so low as to be confiscatory of the property of the defendant (citing Vandalia Railroad Co. v. Schnull, 255 U. S. 113); and that the rate paid by

the consumers from August 1, 1917, to March 1, 1918, was lawful, having been filed and having gone into effect under present Sections 5247 and 5228, Revised Statutes 1929, and was further lawful in that it was neither unreasonable nor excessive as against the consumers and was unremunerative to the defendant. The court denied recovery.

We approve the construction thus placed on said rating statutes. So, the filing by plaintiff of the rates effective August 1, 1917, primarily fixed by plaintiff's schedule were in the circumstances the effective rates *pro tempore,* though their reasonableness was not thereby finally determined. They were, in effect, subsequently found by the commission, upon an investigation and hearing, to be not unreasonable or excessive but inadequate, unjust and unreasonably low; the steam heating service was given thereunder at a complete loss, of which the entire burden was placed upon the light and power consumers or on this plaintiff; and such rates were inequitable as to such consumers, or confiscatory of this plaintiff's property. There is in this record no evidence to the contrary. In either view, therefore, the continuance of the same was against the public welfare. It follows *a priori* that the maintenance of a lower rate (the contract rate) than the later established rate was likewise against the public good. It was not only manifestly so but the statute expressly made it so. This statute (R. S. 1929, sec. 5189), so far as pertinent reads: "No gas corporation, electrical (or heating) corporation, water corporation or municipality shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." This statute establishes a public policy for the public good, in the reasonable and nondiscriminatory exercise of delegated police power.

It is argued for the defendant that paragraph 4 of Section 5208 of the statute expressly preserves heating contracts existing at the time the act was passed. That section in its salient clause declares: "Nothing in this chapter shall be construed to prevent any telegraph or telephone corporation from continuing to furnish the use of its line, equipment or service under any contract or contracts in force at the date this article takes effect or upon the taking effect of any schedule or schedules of rates subsequently filed with the commission, as hereinafter provided, at the rate or rates fixed in such contract or contracts . . . ." It is asserted that Section 5228, which purports to extend the power of the commission in relation to various other utilities "so far as the same shall be practically, legally or necessarily," applicable to heating corporations.

1148

It seems to be well settled by our decisions that the commission has the power to fix by order reasonable telephone, light, power and heating charges at rates exceeding the maximum prescribed by ordinance, franchise, or individual contracts; that such an order does not in the constitutional sense impair the obligations of such contracts; and that such rates automatically supersede all rates coming into conflict therewith. [State ex rel. Sedalia v. Pub. Serv. Comm., 275 Mo. 201, 204 S. W. 497; City of Fulton v. Pub. Serv. Comm. (en banc), 275 Mo. 67, 204 S. W. 386; K. C. Bolt & Nut Co. v. Light & Power Co. (en banc), 275 Mo. 529, 204 S. W. 1074; State ex rel. Washington Univ. v. Pub. Serv. Comm. (en banc), 308 Mo. 328, 272 S. W. 971.] The decisions in the cited cases are based upon the theory that, since our State Constitution (Art. 12, Sec. 5) declares that "the exercise of the police power of the State shall never be abridged," it cannot be contracted away; and under the theory that our Public Service Commission is not a court and cannot enforce contracts; but deals with public utilities upon the theory of public service, without regard to any contracts; that it is a fact-finding body whose findings and orders, being prima facie reasonable and lawful, are subject to judicial review in that respect only.

The Bolt and Nut Company case, supra, is essentially similar to the case at bar. There a public service corporation by written contract agreed to supply electric energy to a private manufacturer for a designated length of time at designated rates. Higher rates were subsequently fixed by the State Public Service Commission by the adoption of a schedule applicable for all services of the kind furnished by the service corporation. The court en banc held that the latter rates, being reasonable, automatically superseded all contract rates coming in conflict with them, and the court denied injunction sought to restrain the collection of the increased rates. The case was affirmed on appeal to the Federal Supreme Court (252 U. S. 571, No. 241) upon the authority of Union Dry Goods Co. v. Georgia Pub. Serv. Corp., 248 U. S. 372, 9 A. L. R. 1420.

The Washington University Case, supra, was a direct attack made against an order of the commission raising rates of a light and power company for electric and heating service. The increased rates were attacked by some eighteen consumers who had previously entered into term contracts with the company for a lower rate than that fixed by the commission. This court held (l. c. 342): "These contracts are of no validity, in so far as they affect rates. The Public Service Commission, in fixing rates, cannot be clogged or obstructed by contract rates. This question was early threshed out by this court in several cases, some of which went to the Federal Supreme Court, in each of which this court was sustained. The orig-

inal case, the ruling in which has never been changed, is State ex rel. City of Sedalia v. Public Service Commission, 275 Mo. 201. . . . As said, such body is not a court, and has neither the power to construe contracts, nor to enforce them.''

So, in the light of our decisions, supra, we have no hesitancy in reaffirming that the statute purporting to preserve existing contracts does not operate to exempt such contracts from the scope of the exercise of the police power of the State to protect or promote the general or public welfare by regulating rates of public utilities so as to raise or lower, as the case may be, previously existing contract rates. We are of the opinion that the commission's findings and order expressly made are in legal effect, since there was no substantial evidence to the contrary, decisive that said contract rate was unreasonable, and that said rate schedule in question superseded the contract rate and rendered the latter nugatory.

The defendant contends strenuously that this cannot be so; that ''before a contract for a utility rate, entered into before the passage of the Public Utility Act, can be deemed to have been abrogated, it is essential that the commission, in the course of an orderly procedure, viz., in a procedure in which the affected parties and the subject matter of the contract are before it, make an express finding that the contract rates are unreasonable.'' This contention goes alike to all the counts. It invokes the contract clause, and the due process clause of the Fourteenth Amendment, of the Federal Constitution. The chief Federal cases cited and relied upon by the defendant are Arkansas National Gas Co. v. Arkansas Railroad Comm., 261 U. S. 379, 67 L. Ed. 705, and Wichita R. & L. Co. v. Public Util. Comm., 260 U. S. 48, 67 L. Ed. 124.

In the Arkansas Case the Public Utility sought injunction against the continuance of rates fixed by contract with consumers, on the ground that they were virtually confiscatory of the property of the utility company as the result largely of improper and wasteful methods of the particular consumers holding the contracts. There was no claim that rates to other consumers were affected by those contracts, nor did it appear that the public interest was involved in the action which the commission was asked to take. The court, after pointing out the power of the State to regulate public utilities and fix rates, notwithstanding what the effect might be to modify or abrogate private contracts, said (l. c. 382) : ''There is, quite clearly, no principle which imposes an obligation to do so merely to relieve a contracting party from the burdens of an improvident undertaking. The power to fix rates, when exerted, is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed, the exertion

of legislative power solely to that end is precluded by the contract impairment clause of the Constitution. The power does not exist *per se*. It is the intervention of the public interest which justifies and, at the same time conditions its exercise." In the present case there was no purpose to relieve the plaintiff of an improvident untaking. Another feature which distinguishes that case from the instant case is shown above; it consists in that here the inadequate rates for heating service were unreasonable and grossly discriminatory as between the users of that service and the users of electrical service, and yielded no revenue from the first-mentioned service. Detriment to the public interest by any recognition of the contract rate is implicit in the later findings and orders made by the commission.

In the Wichita case the Public Utility Commission of Kansas put into effect a schedule of rates in lieu of contract rates. This schedule was filed by the Wichita company and purportedly went into effect with the consent of the commission without a hearing or a finding or a decision involving the same. The Federal Supreme Court adopted the construction which the Kansas Court had placed upon its rating statutes, holding that that schedule was not effective in lieu of the contract rates, and that, in any event, rates previously agreed upon between utilities and patrons will continue in force until the commission has found them to be unreasonable and has prescribed other rates. The court added: "This conclusion accords with the construction put upon similar statutes in other states. Public Utilities Comm. v. Springfield Gas & Elec. Co., 291 Ill. 209; Public Utilities Comm. v. B. & O. S. W. Railroad Co., 281 Ill. 405. Moreover, it accords with general principles of constitutional government."

These principles were stated thus: "In creating such an administrative agency the Legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it certain rules of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined and show a substantial compliance therewith to give validity to its action. When, therefore, such an administrative agency is required as a condition precedent to an order to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective."

Under the construction our court has placed upon our statute authorizing substituted rates for existing rates the statute does not require any finding of facts, or the making of any order as a condition precedent to the validity of plaintiff's schedule of 1917 and its effectiveness as of August 31, 1917. As regards the commission's schedule of substituted rates of March 1, 1918, it does appear that

the same rested upon an express finding of facts and orders of the commission as foundational. In each instance the commission met the requirements of our statutes. These observations and others made earlier herein point out sufficiently, we think, the distinction between the Wichita case and this case, especially as the Federal Courts in their consideration of local constitutions and statutes will follow the construction placed upon them by the State courts. [Georgia Ry. Co. v. Decatur, 262 U. S. 432, 437.]

Furthermore, since the commission was without judicial power to determine finally the defendant's rights under the contract, but only the facts controlling such rights prima facie and tentatively, it would seem that as yet there has been no infringement upon defendant's constitutional guaranties against impairment of contract or denial of due process of law. From the number of cases that have come to this court and the number of parties involved in them, it may fairly be inferred that the rate schedules in question were of more than passing local interest and notoriety, and that the defendants were aware of them from the beginning. The usual process of the courts to determine the validity of the controverted schedules, was available to either party, although defendant was under no necessity to avail itself thereof, since the heat service was not shut off. Yet the matter was in dispute between the parties from the time of the first change in the rate schedule. This suit was brought in 1921, and as stated in the briefs was continued thereafter by common consent, presumably awaiting some fortuitous decision of some kindred case, until it went to trial some eleven years later. Usual process is being availed of by the defendant as well as by the plaintiff in this proceeding, in a mode of procedure provided by the State and adequate to safeguard and determine defendant's contractural rights in the premises. This, we think, meets the requirements of the constitutional right to due process of law. [Hurtado v. California, 110 U. S. 516, l. c. 534, 535.]

The court nisi, pursuant to its denial of declarations of law offered by the defendant, found and adjudged, in substance, as follows: (1) That paragraph 4 of Section 5208 did not operate to keep in force and effect defendant's contract in question during the period involved in counts six to eleven, inclusive, of plaintiff's petition; (2) that to permit plaintiff to recover on said counts six to eleven, inclusive, would be in violation of said contract clause, and the due process clause of the Fourteenth Amendment, of the Constitution; and pursuant to an instruction given at defendant's request the court found and adjudged (3) that to permit plaintiff to recover on counts one to five, inclusive, would be in violation of said contract and due process clauses.

We are of the opinion that that part of the trial court's decision relating to counts one to five, inclusive, was erroneous and that in

respect of counts six to eleven, inclusive, it was correct. As has already been pointed out there is no substantial evidence in the record to support the trial court's denial of a recovery on the first five counts. The entire record made by the commission was presented to the trial court for a present determination from the whole record as a matter of law whether the same contains findings made by the commission which in form or in essence impel the conclusion that during the periods in controversy the defendant's contract rate was unreasonable and against the public interest and was superseded and supplanted by the rate schedules in question. We are of the opinion that such is the proper conclusion. This conclusion is reinforced by the somewhat analogous case of Denney v. Pac. Tele. & Tele. Co., 276 U. S. 97, 72 L. Ed. 483, 48 Sup. Ct. Rep. 223, cited by the plaintiff.

The Denney case dealt, as we are now dealing, with facts accomplished. The court therein, responding to a contention similar to the principal one made by defendant, herein said: ". . . It appears to be argued that the rates provided in the contract should continue until the commission makes an order specifically·declaring and directing in so many words that the contract shall be terminated. We may look over the fact, if need be, that, upon the petition of the city, the rates were reduced in 1913, and that in 1918 they were increased upon application of the gas company, and consider the franchise contract as having been wholly undisturbed until the present time, and still we would be compelled to determine, as we do determine, that the present order of the Department of Public Works is just as effective as if, after fixing the rates, there had been added thereto the words 'and it is hereby directed that the rates provided in the franchise shall be and they are hereby terminated,' or words of similar import. That is the legal effect of what was done, and the form or the language by which it was imported is not very material."

So, on the predetermined and undisputed facts before us we hold that the contract in controversy should be deemed nugatory from and after August 31, 1917.

The judgment of the circuit court is reversed and the cause remanded with directions to enter judgment for the plaintiff on all counts of the petition as prayed therein. All concur.